# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ERIC PAUL DELLARCO, | ) | CASE NO. 4:22-CV-00962-PAB |
| Plaintiff, | ) | |
| | ) | JUDGE PAMELA A. BARKER |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant, | ) | |

## I.      INTRODUCTION

Plaintiff Eric Paul Dellarco[1] ("Mr. Dellarco") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Disability Insurance Benefits ("DIB"). (ECF Doc. 1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to a magistrate judge for preparation of a Report and Recommendation, and it was subsequently reassigned to me pursuant to General Order No. 2022-14. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the final decision of the Commissioner.

## II.      PROCEDURAL HISTORY

---

[1] There is discrepancy in the record regarding the spelling of Mr. Dellarco's last name. Specifically, the ALJ's opinion referred to Plaintiff as "Dell'Arco." (*See generally* Tr. 12-40). However, other portions of the record—and Plaintiff's Merits Brief—identify his last name as "Dellarco." (*See, e.g.*, ECF Doc. 8, PageID#912-33; Tr. 17, 489). For purposes of consistency, this Report and Recommendation will refer to Plaintiff as "Mr. Dellarco" because that is how he is identified in his Merits Brief. Nevertheless, to the extent Mr. Dellarco's name is in fact Mr. Dell'Arco, this Report and Recommendation considers that the case is brought in the name of the actual person.

On July 9, 2020, Mr. Dellarco filed an application for DIB, alleging a disability onset date of May 31, 2016. (Tr. 15, 215-221).[2] His application was denied initially on September 8, 2020, and upon reconsideration on December 31, 2020, and Mr. Dellarco requested an administrative hearing. (Tr. 15, 100-04, 106-10, 111-15). On April 16, 2021, an ALJ held a hearing, during which Mr. Dellarco, represented by counsel, and an impartial vocational expert testified. (Tr. 41-77). On May 7, 2021, the ALJ issued a written decision finding Mr. Dellarco was not disabled. (Tr. 12-40). The ALJ's decision became final on April 8, 2022, when the Appeals Council declined further review. (Tr. 1-6). Mr. Dellarco asserts the following assignments of error in his merits brief:

1. The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul was constitutionally defective.

2. The ALJ committed a harmful error when his RFC failed to find that the effect of the combination of Dellarco's symptoms precluded him from the ability to engage in work at the light level of exertion on a full-time and sustained basis.

3. At Step Four of the Sequential Evaluation, the ALJ erred when he found that Dellarco could still perform his past work as a Sales Representative, Food Products.

(ECF Doc. 8, PageID#912).

On September 21, 2022, Mr. Dellarco notified the Commissioner that he was withdrawing his first assignment of error, *i.e.*, the separation of powers argument. (ECF Doc. 9, PageID#941 n.2). Because Mr. Dellarco has withdrawn his first assignment of error, the only assignments of error that will be addressed in this Report and Recommendation are: (1) whether the ALJ erred when the RFC failed to find that the effect of the combination of Mr. Dellarco's symptoms precluded him from the ability to engage in work at the light level of exertion on a full-time and sustained basis; and (2) whether the ALJ erred at Step Four when he found that Mr. Dellarco could still perform his past work as a food products sales representative.

---

[2] The transcript referred to in this Report and Recommendation is located at ECF Doc. 4 on CM/ECF.

### III.    BACKGROUND INFORMATION

#### A.  *Personal, Educational, and Vocational Experience*

Mr. Dellarco was born in 1963, and he was 56 years old at his date last insured of December 31, 2019. (Tr. 45, 215, 243).[3] He lives with his wife and two adult daughters. (Tr. 50). He graduated from high school and took some vocational education classes. (Tr. 51). He previously worked as a sales representative and kitchen supervisor/consultant. (Tr. 66, 79, 247, 266).

#### B.  *Relevant Hearing Testimony*

##### 1.  <u>Mr. Dellarco's Testimony</u>

Mr. Dellarco testified that he was unable to work due to neck pain, difficulty breathing, and numbness in his arms. (Tr. 56). He stated that he used two inhalers, one of which is an emergency inhaler that he uses approximately three or four days a week. (Tr. 57). He reduced his smoking from two or more packs a day to four or five cigarettes a day. (Tr. 58).

Mr. Dellarco also testified that he had problems with his upper spine and neck. (*Id.*). At the time of hearing, he was scheduled to return to physical therapy in the next 10 days and regularly received injections in his neck from his primary care physician every four months for purposes of treating pain. (Tr. 59). He stated his medical provider discussed the potential of surgery, which would fuse four spinal discs together and immobilize his neck, necessitating that he would have to turn his entire upper body rather than his head. (*See id.*).

Mr. Dellarco also stated that pain radiates down both of his arms. (*Id.*). When this pain reaches his hands, they become numb. (Tr. 59). This pain negatively impacts his ability to open a jar, button a coat, or tie shoes. (*See* Tr. 60). He testified that he has intermittent lower back pain. (*See id.*). He also stated that he has upper back pain. (*Id.*).

---

[3] For DIB, a claimant must demonstrate that a disability existed on or before his date last insured. *See* 42 U.S.C. § 423(c)(1); 20 C.F.R. § 404.101; *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).

Mr. Dellarco reported that on some days he was able to stand for an hour before needing to sit, but on other days he could only stand for 15 minutes before needing to sit for 15 minutes. (Tr. 61). He stated that he could drive, but only short distances due to numbness in his arms and hands. (Tr. 51). He stated that he could not walk up a flight of stairs without becoming winded. (Tr. 61). He also stated that he has gastro and abdominal pain issues. (*Id.*). Specifically, he testified that he has right side abdominal pain every day, which he was told resulted from scar tissue when his intestines burst years ago. (*Id.*). He also stated that he cannot eat at times, and he is adjusting his medication because everything he eats upsets his stomach. (Tr. 61-62).

Mr. Dellarco began treatment for anxiety in 2020. (Tr. 62). He testified that prior to 2020, his family doctor prescribed medication for anxiety. (*Id.*). Mr. Dellarco believes his anxiety is linked to his other alleged health issues. (*See id.*).

Mr. Dellarco discussed his typical day. (Tr. 62-63). He usually wakes up by 2:00 or 3:00 a.m. because he does not sleep well due to difficulty with breathing. (Tr. 62). If he is unable to go back to sleep, he makes coffee. (*Id.*). He will watch the news for a short period of time. (*Id.*). He will try to lay back down and get some more rest. (*Id.*). He will try to do "little things" around the house. (*Id.*).

Finally, Mr. Dellarco testified that he has neuropathy in his feet. (Tr. 63). He stated that he is currently on nerve-blocker medication. (*Id.*). He testified that the medication does not eliminate his pain, although it makes the pain more tolerable. (Tr. 63). He stated that this medication makes him more anxious. (Tr. 64). He wears compression stockings for his neuropathy when he is "going to try and be up and around more." (*Id.*).

## 2.  <u>Vocational Expert's Testimony</u>

The vocational expert ("VE") testified that Mr. Dellarco's past relevant work was as a sales representative and kitchen supervisor/consultant (*Dictionary of Occupational Titles* ("DOT") # 260.357.014) and a food sales representative (DOT # 189.117.050). (Tr. 66). The ALJ asked the VE to consider a person with Mr. Dellarco's age, education, and job history who would be limited to performing work at a light exertional level, with additional limitations of never climbing ladders, ropes, or scaffolds; occasionally stooping, kneeling, crouching, and crawling; frequently balancing; avoiding concentrated exposure to extreme cold and vibrations, extreme heat and humidity and pulmonary irritants; and avoiding all exposure to hazards such as unprotected heights and moving mechanical parts. (Tr. 83). The VE opined that the individual could still perform work as a sales representative and kitchen supervisor/consultant.

As a second hypothetical, the ALJ asked the VE whether an individual with the same characteristics and limitations of the first hypothetical individual and the additional limitation of occasional reaching with bilateral or upper extremities could perform past relevant work. (Tr. 67). The VE testified that this individual could not perform work as a sales representative but could still perform work as a kitchen supervisor/consultant. (*Id.*). The ALJ modified the second hypothetical and asked whether the additional limitation of occasional handling and fingering, as opposed to reaching, would impact past relevant work. (*Id.*). The VE indicated that the individual would still be able to perform work as a kitchen supervisor/consultant. (Tr. 68).

The ALJ's next hypothetical asked whether an individual with the same functional limitations as the first hypothetical individual and the additional mental limitations of being able to perform a light variety of simple and complex tasks, unable to perform tasks that required a high production rate, and unable to respond appropriately to occasional change in a routine work setting

could perform past relevant work. (Tr. 68). The VE opined that such an individual would no longer meet past relevant work. (*Id.*). The ALJ also asked whether this individual would have any available jobs in the economy if reduced to occasional fingering and handling. Prior to Mr. Dellarco's 55th birthday, the VE opined that the light jobs of an office helper (DOT# 239.567.010), cleaner (DOT #323.687.014), and mail clerk (DOT#209.687.026) would have been available. (Tr. 69).

The VE also opined that tolerance for being off-task for unskilled work is 10% or below, and eight unexcused absences per year. (Tr. 70-71).

Mr. Dellarco's counsel asked whether the VE gave any consideration to amending Mr. Dellarco's work history to that of a composite job of a consultant and kitchen supervisor. (*See* Tr. 73). The VE opined that the position of kitchen supervisor/consultant would be eliminated because it would require medium exertional level. (Tr. 74). The VE also indicated that there would be no transferrable skills from the composite job that would transfer to the ALJ's sedentary hypothetical. (*Id.*).

### C. *Relevant Medical Evidence*

Mr. Dellarco primarily challenges the ALJ's findings regarding his back, neck, and upper extremity symptoms (*i.e.*, pain, numbness, and tingling); respiratory problems; severe fatigue; and headaches. (*See generally* ECF Doc. 8). The ALJ summarized Mr. Dellarco's health records and symptoms as follows:[4]

### *COPD and Asthma*

In terms of the alleged COPD, office notes from primary care physician Michael Evan, M.D., extend back to May 2015 and include some intermittent bouts of acute bronchitis with symptoms of cough and wheezing, and a similar concern was the basis for returning to Dr. Evan on May 31, 2016—i.e., the alleged onset date in this application (Ex. 6F/59-36; 6F/33-34). At all such visits, however, Dr. Evan's

---

[4] The ALJ's medical evidence summary reproduced here only includes discussion pertinent to the disputed findings.

physical examinations of the lungs revealed normal respiration rate and clear lungs to auscultation anteriorly, posteriorly, and laterally. April 11, 2016 chest x-rays revealed normal findings including appearance of the lungs (Ex. 5F/39-40).

On July 13, 2016, Mr. Dell`Arco attended a pulmonology consult with Tabassum Nafsi, M.D., for cough, but the specialist also returned a normal examination of respiratory functioning with normal respiratory effort and normal auscultation and inspection of the chest (Ex. 1F/1,5). Pulse oxygenation was normal at 98% on room air (Ex. 1F/4).

However, Dr. Nafsi ordered a pulmonary function test, which took place on the same day as the consult, which revealed moderate obstructive ventilatory impairment with air trapping and a forced expiratory volume at 74.4% of predicted maximum, moderate hyperinflation demonstrated by measured lung volumes, and moderately reduced diffusion capacity (Ex. 1F/5,8-9; 6F/101). With no significant improvement shown on aerosolized bronchodilator therapy on the pulmonary function test, Dr. Nafsi diagnosed moderate COPD and uncomplicated asthma, he prescribed twice-daily use of a Symbicort inhaler, and he added a second daily inhaler (Tudorza) (Ex. 1F/5-6).

The July 2016 pulmonary function test substantiates both COPD and asthma as medically determinable impairments that could reasonably be expected to cause the alleged symptom of shortness of breath on physical activities. However, Mr. Dell`Arco did not return to pulmonology specialty over the next three and one-half years through the date last insured, or until September 2020 for that matter, which does not generally support that the prescribed use of inhalers did not improve his symptom and ability to function (Ex. 9F/1-5).

Moreover, later 2016 and 2017-2019 office treatment notes from his primary care physician show continually unremarkable findings on physical examinations of the lungs and respiratory body system, few instances of presenting complaints including acute upper respiratory tract symptoms (e.g., cough and congestion) that were only present for a week or so and that occasioned short courses of oral antibiotics and steroids, and overall no indication to send him back to the pulmonologist for significant chronic respiratory symptoms not managed well by the inhalers (*see generally* Ex. 6F/1-32; and *see* Ex. 6F/29-30,22-23,17-18).

There were no hospital visits or other noted exacerbations of respiratory conditions throughout the approximately four-year period at issue through the date last insured.

Other physicians who examined Mr. Dell`Arco during the relevant timeframe have not observed any coughing spells or shortness of breath, but rather returned normal medical findings on examinations of the lungs, including normal respiratory effort, normal breath sounds, and absent wheezes or rhonchi to auscultation (*see, e.g.*, Ex.

3F/10). A May 26, 2017 CT scan of the abdomen (and pelvis) incidentally showed unremarkable appearance of the lungs (Ex. 3F/4-5).

Additionally relevant to the severity of the respiratory symptoms, Mr. Dell`Arco received tobacco cessation counseling in relation to a 30-year history of smoking at least one full pack of cigarettes daily, and he was advised to engage in smoking cessation by Dr. Nafsi and, repeatedly, by his primary care physician (Ex. 1F/1,5; 6F/30,10-11). A late October 2019 office note from Dr. Evan relates that Mr. Dell`Arco continued to smoke one pack per day, which does not impress for any significant efforts having been made at stopping smoking through the relevant timeframe (Ex. 6F/7). Not until the February 2021 pulmonology visit was there a reported decline in smoking down to one-half pack per day (Ex. 13F/16).

…

Lastly, this record contains medical records from primary care and pulmonology in 2020-2021, and thus after the relevant period, strongly indicating worsening severity of symptoms and occasioning the increased treatment that Mr. Dell`Arco had discussed in testimony at the April 2021 hearing. Such evidence begins with a late July 2020 primary care office note with a noticeable breakthrough presenting complaint of shortness of breath that is not shown in the 2019 office notes (Ex. 6F/60), a new chest x-ray that was unremarkable (Ex. 8F/3-4), a return to pulmonology specialty in mid-September 2020 that contains a remarkably positive sign of scattered wheezing and change in medication to "high dose" Symbicort (Ex. 9F/1-5), an October 2020 CT lung screening for lung cancer that showed mild to moderate centrilobular emphysema (Ex. 12F/128-130), the February 2021 follow-up with pulmonology showing diminished breath sounds and resonant lungs with even greater expansion of treatment to oral Singulair and Xolair injections and an AirDuo inhaler at highest allowed dosage (Ex. 13F/16-19), and the same-day pulmonary function study showing greater reductions in FEV1 and FVC compared to the 2016 study with a diagnosis of asthma-COPD overlap syndrome (Ex. 13F/20-22). Such objective medical and other medical evidence well after the date last insured shows that COPD with asthma has worsened but not until after the relevant period subject to this Title II application.

…

### Musculoskeletal Disorders of the Spine, Osteoarthritis, and Neuropathy

In terms of the alleged spinal conditions primarily affecting the neck, upper extremities, and upper back, the record contains a July 2015 consult with orthopedic/spinal medicine specialist Joseph Cerimele, D.O., for "nuisance type" pressure pain in the neck for many years, associated headache and ringing in the ears, and more recently developing but "rare" symptoms of periodic numbness in the left arm and hand-fingers (Ex. 6F/95-97). Dr. Cerimele noted a decreased reflex in both upper extremities along the C6 spinal nerve-root distribution, reduced and

painful cervical spinal range of motion in most aspects, and some pain in the shoulders. X-rays done at that time showed moderate degenerative disc disease at the C3 through C7 levels of the cervical spine, with neuroforaminal narrowing at most of those levels (Ex. 2F/5; 5F/43-44). Concerned with cervical radiculopathy, Dr. Cerimele ordered an electromyogram (EMG), but this was not apparently done.

However, an August 2015 MRI of the cervical spine revealed the radiographic evidence of degenerative disc disease and illuminated further mild to moderate central canal stenosis at the C3 through C7 disc levels, mild to slight cord impingement at C3-C4 and C4-C5, and neuroforaminal stenosis ranging from mild to severe at all four affected disc levels (Ex. 2F/5; 6F/126- 127). Following the MRI, Mr. Dell`Arco attended a course of formal physical therapy over September 24-October 16, 2015 for cervical spinal pain with radicular symptoms into both arms, and he attended 10 sessions of treatment before he did not return to complete the additionally indicated therapy visits (Ex. 6F/130-131,132). Over the period of documented primary care in May 2015-May 2016, Dr. Evan was periodically administering intramuscular kenalog injections for addressing chronic neck pain, albeit attributed to a diagnosis of fibromyalgia that I have previously discussed as failing the requisite criteria for a medically determinable impairment (SSR 12-2p) (Ex. 6F/9-33).

….

On June 27, 2016, Mr. Dell`Arco attended a consult with pain-management specialist Shawn Donatelli, D.O., for primarily severe, near constant neck pain, painful numbness and tingling in both upper extremities, and limited neck mobility (Ex. 2F/1). He told Dr. Donatelli that Dr. Evan's regular pain injections had been "quite helpful" until recently in managing those symptoms. Dr. Donatelli observed on focused musculoskeletal examination of the posterior neck and cervical spine positive tenderness and muscle spasms and moderately reduced range of motion in all planes; and he found bilaterally absent biceps, triceps, and brachioradialis muscles in the upper extremities (Ex. 2F/3-4). Based on those symptoms and medical signs paired with his review of the 2015 MRI and x-rays, he diagnosed cervical spondylosis, stenosis, disc degeneration, and radiculopathy (Ex. 2F/5). He prescribed oral tramadol medication and recommended a three-part series of cervical facet-joint injections, which he administered on July 23rd, August 9th, and August 23rd of 2016 (Ex. 2F/5,7; 6F/128,79,77).

An October 5, 2016 nerve conduction study (NCS) and EMG of the bilateral upper extremities confirmed C7 root pathology supportive of Dr. Donatelli's clinical diagnosis of cervical radiculopathy, with cervical spinal-associated compression neuropathies in the distal median and ulnar aspects without axonal loss and, as such, not diagnostic of separate peripheral neuropathy or mononeuropathy in the upper extremities (Ex. 2F/14,17-18).

Following the second and third injections, he endorsed moderate declining to mild improvement and waxing, waning symptoms "to a significant degree," but with more frequently occurring numbness in his left arm (Ex. 6F/77; 2F/8,10). But Dr. Donatelli found no change in his initial examination's findings at September 2016 and October 2016 follow-up visits, which notably included intact sensation in both upper extremities (*i.e.*, despite reflex loss), negative Spurling's test for clinically evidenced nerve-root or spinal cord compression at the cervical spine, normal muscle strength and tone in all groups of the upper extremities, and normal inspection, palpation, and ranges of motion observed at the bilateral shoulders, elbows, wrists, and hands (Ex. 2F/3- 4,9-10,13-14).

Mr. Dell`Arco would not return to the pain specialist after those three two 2016 follow-up visits, and he received from Dr. Evan three intramuscular kenalog injections over year 2017, followed by two injections in 2018, and none in 2019 (*see* Ex. 6F/65,26,24,22,20,15). The primary care physician did not conduct any musculoskeletal examination of the cervical spine, but he found negative abnormalities as to the soft tissues of the neck at all 2016-2019 office visits. Several of the office visits appear to be prompted by no symptoms and only a request to have another kenalog injection, which are infrequent and become more distanced over the latter two years of the relevant timeframe (*see, e.g.,* Ex. 6F/26,20,15). Furthermore, there were numerous other office visits prompted by acute and short-lived ailments, such as cellulitis from a bee sting, acute upper respiratory tract infections, skin tags, and the two instances of right lower leg pain in July 2019 and in October-November 2019, the latter following a laceration injury (Ex. 6F/26,22,17, 12,9,5,4,1).

At no point over 2017-2019 did Dr. Evan refer Mr. Dell`Arco back to the pain specialist or to physical therapy, which strongly indicates that the intermittent kenalog injections and any oral prescribed medications were managing the neck pain and upper extremity symptoms to a point greater than reflected in the alleged constant persistence, high intensity, and functionally limiting effects of these specific symptoms on using the hands, lifting even a gallon of liquid with one arm, not completing cleaning and other chores around the house without taking breaks, standing for prolonged periods, and other physical abilities. No medical source during the relevant timeframe indicated surgery as a treatment for the neck pain and upper extremity symptoms.

As with the respiratory symptoms, there is comparative support for worsening numbness and tingling in the hands that occasioned initiation of gabapentin medication, but this did not occur until October-November 2020 and thus well after the relevant timeframe ending in December 2019 (Ex. 13F/7-9,11-13). The February 2021 return visit to Dr. Cerimele six years after the 2015 consult contains a report of worsening neck pain and numbness in the arms, and signs of diminished sensation in two fingers and 4/5 strength in the shoulders that are not reflected in any 2015-2019 medical examination and, as such, do not substantiate that such

10

worsening of symptoms and medical signs occurred prior to the date last insured (Ex. 13F/27-29).

…

In terms of the other locations of pain and the alleged neuropathy, Mr. Dell`Arco related to Dr. Cerimele in July 2015 orthopedic consult that "he has been told that he has peripheral neuropathy in the legs" (Ex. 6F/95), and he subsequently conveyed to Dr. Donatelli in June 2016 that he has tingling and burning sensation in the ankles and feet (Ex. 2F/1). At the latter time, he also presented with burning-type low back/lumbar pain but characterized that as "of lesser consequence" to the neck, upper extremity, and ankle/foot symptoms. Dr. Donatelli found some hyperesthesia on examination of the ankles and feet, but rated this as mild in severity. Similarly, he found mild restriction of thoracolumbar spinal mobility at the June 2016 consult and at both of the later 2016 follow-up visits (Ex. 2F/3-4,9-10,13-14).

(Tr. 26-31).

## IV.   THE ALJ'S DECISION

In his May 7, 2021 decision, the ALJ made the following findings:[5]

1.   The claimant last met the insured status requirements of the Social Security Act on December 31, 2019.

2.   The claimant did not engage in substantial gainful activity during the period from his alleged onset date of May 31, 2016 through the date last insured of December 31, 2019 (20 CFR 404.1571 *et seq*.).

3.   Through the date last insured, the claimant had the following severe impairments: degenerative disc disease, stenosis, spondylosis, and radiculopathy of the cervical spine; degenerative disc disease and stenosis of the lumbar spine; osteoarthritis; chronic obstructive pulmonary disease (COPD) and asthma; and neuropathy (20 CFR 404.1520(c)).

4.   Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.   After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform

---

[5] The ALJ's findings are summarized.

light work, as defined in 20 CFR 404.1567(b), except that he was further limited in the following nonexertional respects:

> - Could never climb ladders, ropes, or scaffolds but could occasionally climb ramps and stairs; could occasionally stoop, crouch, kneel, and crawl; and could frequently balance;
> - Could frequently reach, handle, and finger with the bilateral upper extremities; and
> - Needed to avoid concentrated exposure to extreme cold, vibration, extreme heat and humidity, and pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation; and needed to avoid all exposure to hazards such as unprotected heights and moving mechanical parts.

6.  Through the date last insured, the claimant was capable of performing past relevant work as a Sales Representative, Food Products. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.  The claimant was not under a disability, as defined in the Social Security Act, at any time from May 31, 2016, the alleged onset date, through December 31, 2019, the date last insured (20 CFR 404.1520(f)).

(Tr. 17-35).

## V.    LAW AND ANALYSIS

### A.  *Standard of Review*

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip* at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B.  *Standard for Disability*

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments,

meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C.  SSR 16-3p – Subjective Symptoms Assessment

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). An ALJ is not required to accept a claimant's subjective symptom complaints, however, and may properly discount the claimant's testimony about a claimant's symptoms when it is inconsistent with objective medical and other evidence. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003); SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence."). In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate his symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional

limitations and restrictions. SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

> ### D. *Whether the ALJ Erred by Failing to Find that the Effect of the Combination of Mr. Dellarco's Symptoms Precluded Him from the Ability to Engage in Work at the Light Level of Exertion on a Full-Time and Sustained Basis[6]*

Mr. Dellarco's first assignment of error is that the ALJ erred by failing to find that the effect of the combination of Mr. Dellarco's symptoms precluded him from the ability to engage in work at the light level of exertion on a full-time and sustained basis. (ECF Doc. 8, PageID#923-30). He raises the following sub-claims: (1) the ALJ's SSR 16-3p assessment failed to consider his disabling pain that interfered with his ability to sustain activities and to use his hands and stand/walk the time required to perform his past relevant work; (2) the ALJ violated SSR 19-4p because he failed to find Mr. Dellarco's headaches were a severe impairment; (3) the ALJ failed to consider the waxing and waning of Mr. Dellarco's symptoms of pain, numbness, and tingling; (4) the ALJ ignored Mr. Dellarco's severe fatigue and failed to include limitations related to Mr. Dellarco's "debilitating fatigue"; and (5) the ALJ failed to provide "any supportable rationale" for his finding that Mr. Dellarco's statements were not entirely consistent with the medical evidence.[7] For the reasons below, these sub-claims lack merit.

---

[6] Courts in the Northern District of Ohio have previously instructed Mr. Dellarco's counsel to refrain from combining disparate challenges and arguments regarding the sequential disability evaluation together in a single assignment of error. *See, e.g.*, *Nelson v. Comm'r of Soc. Sec.*, No. 1:21-CV-01784-JG, 2023 WL 2435332 (N.D. Ohio Jan. 31, 2023), *report and recommendation adopted*, 2023 WL 2431989; *Overstreet v. Comm'r of Soc. Sec.*, No. 1:21-CV-2062, 2022 WL 15524729, at *11 n.9 (N.D. Ohio Oct. 11, 2022) (citing Case No. 1:21-cv-00556, Doc. 19, at 34 n.7 (filed 3/2/2022); Case No. 5:20-cv-02850, Doc. 19, at 34 n.5 (filed 2/2/2022); Case No. 5:20-cv-01340, Doc. 21, at 26 n.9 (filed 8/16/2021); Case No. 1:20-cv-01186, Doc. 21, at 25 n.8 (filed 8/16/2021)), *report and recommendation adopted*, No. 1:21CV2062, 2022 WL 15522981 (N.D. Ohio Oct. 27, 2022)).

[7] This Report and Recommendation will address the first and fifth sub-claims at the end of its analysis of the relevant assignment of error because both sub-claims are essentially the same and rely on evidence previously discussed and addressed in earlier sub-claims.

1.  **The ALJ Did Not Err In the Evaluation of Mr. Dellarco's Headaches**

Mr. Dellarco asserts that the ALJ erred by concluding that the evidence did not substantiate the existence of any primary headache disorder. (*See* ECF Doc. 8, PageID#926-27). Mr. Dellarco argues that he reported headaches to his treating sources throughout the relevant period. (*Id.* at PageID#926 (citing Tr. 320, 333, 361, 479)). He states that these headaches were documented by the treating sources and evaluated in light of his cervical spine problems. (*Id.* at PageID#926-27). He points to the following objective testing in support: (1) an August 2015 cervical MRI with positive findings of mild central canal stenosis with mild cord impingement and moderate severe right/moderate left neural foraminal stenosis at C3/4, mild/moderate central canal stenosis with slight cord impingement and severe foraminal stenosis at C4/5, mild central canal stenosis and severe right/moderate to severe left neural foraminal stenosis at C5/6, and mild central canal stenosis at C6/7 (Tr. 336, 600-01); and (2) an October 2016 EMG demonstrating evidence of root-level pathology in the C-7 paraspinal mass which supported radiculopathy along with distal median and ulnar compressive neuropathies (Tr. 348-49, 850-51). Based on these findings, Mr. Dellarco contends he satisfied the requirements of Listing 11.02A and/or 11.02B. (*See* ECF Doc. 8, PageID#926-27).

The ALJ concluded the following regarding Mr. Dellarco's alleged headaches:

> Although Mr. [Dellarco] has at times presented with a complaint of headache likened to a migraine, the medical evidence of record does not substantiate the existence of any "primary headache disorder" under SSR 19-4p, as such symptom is readily attributable to the cervical spine disorders (*see, e.g.*, Ex. 6F/42,5).

(*Tr.* 22).

SSR 19-4p provides guidance on how "primary headache disorders" such as migraines, tension-type headaches, trigeminal autonomic cephalagias/cluster headaches are established and evaluated. *See* SSR 19-4p, 84 Fed. Reg. 44667, 44667-71 (Aug. 26, 2019). The "primary

headaches disorders" that are addressed in SSR 19-4p are explicitly distinguished from "secondary headaches (for example, headache attributed to trauma or injury to the head or neck or to infection)," which the Ruling explains cannot be considered as medically determinable impairments because they "are symptoms of another underlying medical condition." SSR 19-4p, 84 Fed. Reg. 44667, 44670.

Mr. Dellarco challenges the ALJ's decision not to identify a primary headache disorder as a severe impairment at Step Two. Because the application of SSR 19-4p is only appropriate for a primary headache disorder—as opposed to "secondary headaches" stemming from other medical impairments or causes—the issue here is whether the ALJ's decision not to identify a primary headache disorder as a severe impairment was supported by substantial evidence. Here, as stated above, the ALJ concluded that the medical evidence in the record did not substantiate the existence of any primary headache disorder under SSR 19-4p "*as such symptoms is readily attributable to the cervical spinal disorders*." (Tr. 22 (citing Tr. 479, 516) (emphasis added)).

Mr. Dellarco contends that he reported headaches during the relevant period to his treating providers. Relying on his cervical spine MRI showing stenosis and an EMG showing evidence of nerve root pathology at one level of the cervical spine, he asserts that his headaches were "evaluated in light of his cervical spine problems" and was "further supported by objective testing." (ECF Doc. 8, PageID#926-27). Yet, Mr. Dellarco's cited evidence appears to undercut his entire argument that the ALJ should have found a primary headache disorder. (Tr. 946). Rather, this evidence of headaches that was "evaluated in light of his cervical spine problems" (ECF Doc. 8, PageID#927) would support the ALJ's conclusion that his headache symptoms were in fact "readily attributable to the cervical spine disorders." (Tr. 22).

Moreover, Mr. Dellarco does not provide any argument or evidence demonstrating that his headaches meet the diagnostic criteria for any primary headache disorder as outlined in SSR 19-4p. Nor has Mr. Dellarco provided any argument or evidence demonstrating that such a diagnosis has been established as a medically determinable impairment in the existing record. The ALJ's findings clearly indicate that the ALJ considered the headaches as symptoms of Mr. Dellarco's cervical spine disorders, and the ALJ thus construed them as secondary headaches that are not subject to SSR 19-4p. (*See* Tr. 22). Significantly, the evidence Mr. Dellarco cites in support of his argument buttresses the ALJ's conclusion. Given the absence of a severe primary headache disorder in the record, Mr. Dellarco fails to meet his burden of demonstrating that the ALJ erred in failing to discuss SSR 19-4Pp or Listing 11.02.

Even if an analysis of Mr. Dellarco's headaches under SSR 19-4p and Listing 11.02 were appropriate for this case - which it is not - Mr. Dellarco failed to demonstrate that the evidence in the record dictated a finding that he medically equaled Listing 11.02. SSR 19-4p provides guidance regarding a Listings analysis for primary headache disorders, stating in part:

> Primary headache disorder is not a listed impairment in the Listing of Impairments (listings);[ ] however, we may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing.[ ]
>
> Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing.
>
> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache

18

disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 84 Fed. Reg. 44667, 44670-71.

The record does not support a finding that the ALJ erred by not finding that Mr. Dellarco's headaches medically equaled Listing 11.02B.[8] SSR 19-4p provides that an 11.02B analysis should consider "[a] detailed description from an AMS [acceptable medical source] of a typical headache event, including all associated phenomena…; the frequency of headache events; adherence to prescribed treatment; side effects of treatment …; *and* limitations in functioning…" SSR 19-4p, 84 Fed. Reg. 44667, 44671 (emphasis added). This Ruling "not only emphasizes the importance of considering measures of both frequency and severity of reported headaches, but also highlights that those factors should be established in part by contemporaneous reports to treating providers." *Reese v. Comm'r of Soc. Sec.*, No. 5:20-cv-2385, 2022 WL 1090538, at *25 (emphasis removed) (citing SSR 19-4p), *report and recommendation adopted*, 2022 WL 831122 (N.D. Ohio Mar. 21, 2022).

A cursory review of Mr. Dellarco's evidence cited in support of his argument reveals that it lacks the detailed descriptions of headache events contemplated in SSR 19-4p, and it is not sufficiently explicit as to the frequency, severity, and associated symptoms of Mr. Dellarco's headaches to support an equals Listings analysis under SSR 19-4p and Listing 11.02. (*See*

---

[8] To the extent that Mr. Dellarco attempts to assert that the ALJ erred in failing to find his headache a severe impairment based on Listing 11.02A criteria, this argument fails because Listing 11.02A is inapplicable to headaches. (*See* ECF Doc. 8, PageID#926); SSR 19-4p, 2019 WL 4169635, at *7 (Aug. 26, 2019); *Gross v. Comm'r of Soc. Sec.*, No. 3:22-cv-229, 2022 WL 17717422, at *6 (N.D. Ohio Oct. 26, 2022) ("[The claimant's] argument that [he] satisfies Listing 11.02A also fails because Listing 11.02A doesn't apply to headaches."); *Reese v. Comm'r of Soc. Sec.*, No. 5:20-cv-2385, at *24 (N.D. Ohio Jan. 31, 2022), *report and recommendation adopted*, 2022 WL 831122 (N.D. Ohio Mar. 21, 2022).  ("It is noted that SSR 19-4p does not provide for an 'equals Listings' analysis of primary headaches disorders under Listing 11.02A…but only under Listings 11.02 B and D[.]").

*generally* Tr. 320 (notation that Mr. Dellarco had a "headache"); Tr. 333 (notation that Mr. Dellarco "occasionally" had headaches and that the pertinent negatives were "severe facial pain, seizures of unknown type"); Tr. 361 (notation that Mr. Dellarco complained of "frequent headaches" but denied "dizziness, fainting, migraine, seizures, tremors, vertigo, memory loss"); Tr. 479 (notation that Mr. Dellarco was assessed with a migraine headache that was "not intractable…[and] without status migrainosus[9]").

Similarly, Mr. Dellarco's argument that the ALJ failed to discuss any effects his headaches would have on his ability to perform his past relevant work (*see* ECF Doc. 8, PageID#927) is unavailing. It is clear when reading the ALJ's decision as a whole that the ALJ did not ignore Mr. Dellarco's headache complaints in the RFC assessment. Rather, the ALJ concluded that the medical evidence was "no more than partially consistent with the alleged intensity, persistence, and functionally limiting effects of neck pain … and any associated symptoms ***including headaches***." (Tr. 30 (emphasis added)).

In summation, the ALJ was not required to provide an explicit discussion of Listing 11.02 B. As stated above, the ALJ concluded that the medical evidence was "no more than partially consistent with the alleged intensity, persistence, and functionally limiting effects of neck pain …and any associated symptoms including headaches." (Tr. 30). This finding is supported by substantial evidence. And Mr. Dellarco failed to meet his burden at Step Three to demonstrate his headaches medically equaled Listing 11.02B. Accordingly, this sub-claim is without merit.

---

[9] Status migrainosus is a "rare and severe type of migraine that can last longer than 72 hours." Cleveland Clinic, Migraine Headaches,  https://my.clevelandclinic.org/health/diseases/5005-migraine-headaches (last visited Apr. 19, 2023).

## 2. The ALJ Properly Considered Mr. Dellarco's Waxing and Waning Symptoms of Pain, Numbness, and Tingling

Mr. Dellarco's next sub-claim asserts that the ALJ failed to consider the variability (*i.e.*, "waxing and waning") of his symptoms of numbness and tingling. (ECF Doc. 9, PageID#927-28). He argues that the variability of his symptoms is supported by Dr. Donatelli's notes that Mr. Dellarco's symptoms were "waxing and waning," *i.e.,* that at times Mr. Dellarco had "a good day," but on a few days he had "a very difficult time." (ECF Doc. 8, Page ID#927-28 (citing Tr. 339)). Mr. Dellarco asserts that this record demonstrated that his numbness and tingling interfered with his ability to perform activities of daily living. (*Id.* at PageID#928). Thus, Mr. Dellarco argues that remand is necessary because the ALJ failed to consider the variability of Mr. Dellarco's symptoms. (*Id.*).

Mr. Dellarco's argument is not well-taken because a review of the ALJ's decision reveals that the ALJ did in fact consider the waxing and waning of Mr. Dellarco's symptoms. Significantly, the ALJ discussed the same evidence that Mr. Dellarco cites in support of his variability argument. (*See* Tr. 29). Specifically, the ALJ noted that Dr. Donatelli endorsed moderate declining to mild improvement, and waxing and waning symptoms "to a significant degree" following Mr. Dellarco's second and third injections. (Tr. 29 (citing Tr. 339, 341, 551)). The ALJ also pointed to Mr. Dellarco's report to Dr. Donatelli of more frequent numbness in his left arm. (Tr. 29 (citing Tr. 339)). However, the ALJ also observed that Dr. Donatelli found no changes in his initial examination findings at Mr. Dellarco's follow-up visits in September 2016 and October 2016. (Tr. 29). Specifically, the ALJ pointed to findings that included intact sensation in both upper extremities despite reflex loss, negative Spurling's test for clinically evidenced nerve-root or spinal cord compression at the cervical spine, normal muscle strength and tone in all groups of the upper extremities, and normal inspection, palpation, and ranges of motion observed at the bilateral

shoulders, elbows, wrists, and hands. (Tr. 29 (citing Tr. 334-335, 340-41, 344-45)). The ALJ ultimately concluded that additional RFC limitations were not justified given the totality of the evidence during the relevant period. (*See* Tr. 32).

Mr. Dellarco further fails to demonstrate how the evidence he cites demonstrates that his symptoms at their peak would be disabling or would persist at such a level for long periods. (*See generally* ECF Doc. 8, PageID#927-28). To demonstrate lack of substantial evidence, Mr. Dellarco must do more than "pointing to evidence of the record that supports [his] position." *See Walters v. Comm'r of Soc. Sec.*, No. 1:18-cv-1647, 2019 WL 2212635, at *8 (N.D. Ohio May 22, 2019). Rather, Mr. Dellarco must demonstrate that "there is not sufficient evidence in the record that would allow a reasoning mind to accept the ALJ's conclusion." *Greene v. Astrue*, No. 1:10-cv-0414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010). Because Mr. Dellarco has failed to demonstrate that the ALJ erred, this argument fails.

### 3. The ALJ Sufficiently Addressed Mr. Dellarco's Reported Severe Fatigue and Shortness of Breath

Finally, Mr. Dellarco contends that the ALJ failed to sufficiently address his reported severe fatigue. (*See* ECF Doc. 8, PageID#928-29). Mr. Dellarco asserts that the ALJ erred by failing to find any limitations related to his "debilitating fatigue." (ECF Doc. 8, PageID#928). He argues that the ALJ erred because the ALJ ignored relevant medical evidence documenting Mr. Dellarco's symptoms, which included complaints to his treating sources of shortness of breath and fatigue. (*Id.* (citing Tr. 320, 354, 361, 484, 487, 492, 495, 497)). Thus, Mr. Dellarco argues that remand is necessary.

This argument fails because a review of the ALJ's decision reveals that the ALJ adequately addressed Mr. Dellarco's reported severe fatigue and shortness of breath. Indeed, the ALJ's decision notes Mr. Dellarco's subsequent statements accompanying his request for reconsideration

and his administrative hearing testimony regarding his shortness of breath and fatigue. (Tr. 25 (citing Tr. 61, 278, 284)). Yet, as demonstrated below, the ALJ reviewed the medical records regarding Mr. Dellarco's respiratory problems (Tr. 26-28), and the ALJ concluded that Mr. Dellarco's statements about his symptoms were "no more than partially consistent" with the relevant objective medical evidence and other medical factors relating to treatment, statements to his physicians, and continued consumption rate of tobacco smoking through the date last insured, as well as a comparative analysis to clearly worsening symptoms, positive medical signs, laboratory findings, and increasing treatment at a point nine months to a year after that date." (Tr. 28).

The ALJ supported this conclusion by discussing at length Mr. Dellarco's COPD, asthma, and any other symptoms stemming from these impairments. (Tr. 26-28). Specifically, as stated above,  the ALJ's opinion discussed: (1) that Mr. Dellarco's later 2016 and 2017-2019 office treatment from his primary care physician continually showed unremarkable findings on physical examinations of the lungs and respiratory body symptoms (Tr. 27; *see generally* Tr. 475-506); (2) that other physicians who examined Mr. Dellarco during the relevant timeframe had not observed any coughing spells or shortness of breath, and instead returned normal medical findings on examinations of Mr. Dellarco's lungs (Tr. 27; *see, e.g.*, Tr. 362); and (3) that Mr. Dellarco continued to smoke daily during the relevant period (Tr. 27; *see* Tr. 317, 321, 481, 484-85, 504). The ALJ even pointed out that Mr. Dellarco's 2020-2021 primary care and pulmonology care records indicated worsening in the severity of symptoms, but the ALJ noted that these records were after the relevant period. (Tr. 27-28). Based on this evidence, the ALJ concluded that the evidence did not support an alleged limitation in Mr. Dellarco's walking ability, but did support a restriction to light exertion work. (*See* Tr. 28). Thus, the ALJ adequately addressed and discussed

23

Mr. Dellarco's fatigue and shortness of breath. Accordingly, this sub-claim lacks merit because Mr. Dellarco failed to establish how the ALJ did not consider Mr. Dellarco's severe fatigue and shortness of breath.

4.  **The ALJ Properly Assessed Mr. Dellarco's Symptoms Under SSR 16-3p and Provided Substantial Evidence and Supportable Rationale for His RFC Determination**

Mr. Dellarco asserts two sub-claims challenging the ALJ's SSR 16-3p assessment. First, he contends that the ALJ's SSR 16-3p assessment failed to properly evaluate his pain symptoms. (ECF Doc. 8, PageID#923-26). Specifically, he argues that the ALJ failed to consider that Mr. Dellarco experienced pain that interfered with his ability to sustain activities, as well as his ability to use his hands, stand, and walk – all of which are required to perform his past relevant work. (*Id.* at PageID#926). Second, Mr. Dellarco asserts in another subclaim that the ALJ failed to articulate "any supportable rationale" for his finding that Mr. Dellarco's statements were not entirely consistent with the medical evidence. (*See id.* at PageID#929-30).

Mr. Dellarco's assertion that the ALJ failed to consider his alleged pain overlooks the ALJ's SSR 16-3p assessment. Mr. Dellarco asserts conclusorily that the ALJ erred, but he fails to explain *how* the ALJ erred in the ALJ's detailed discussion of Mr. Dellarco's alleged pain symptoms. (*See generally* ECF Doc. 8, PageID#925-26). Here, the ALJ assessed the objective medical evidence, including signs and laboratory findings, as well as Mr. Dellarco's course of treatment. Based on the ALJ's assessment of this evidence, the ALJ concluded that Mr. Dellarco's symptoms were "only partially consistent with the medical evidence and other evidence in the record relevant to the period through the December 2019 date last insured, to the extent reflected in this [f]inding of residual functional capacity for a range of light exertion work." (Tr. 32). And

in discussing Mr. Dellarco's pain symptoms, the ALJ articulated his reasoning using several of the factors outlined in 20 C.F.R. §§ 404.1529, 416.929; SSR 16-3p.

Over the course of five pages, the ALJ detailed and discussed the objective medical evidence regarding Mr. Dellarco's neck pain, neuropathy, and respiratory problems. (Tr. 27-31) - all of which the ALJ found did not support additional limitations. *See* 20 C.F.R. § 404.1529(c)(2); SSR 16-3p, 2017 WL 5180304, at *5 ("[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms…"). With respect to Mr. Dellarco's neck pain, the ALJ specifically noted the July 2015 consult with Dr. Cerimele, which is the same evidence that Mr. Dellarco now cites in support of his argument. (Tr. 28). The ALJ even discussed Mr. Dellarco's treatment of his back, neck, and upper extremity symptoms with medications and injections provided by his primary care provider. (Tr. 29, 489-90, 494-501, 505-07).

With respect to Mr. Dellarco's lower back pain and lower extremity neuropathy, the ALJ observed that there was a lack of objective evidence that supported any severe limitation in Mr. Dellarco's ability to stand or walk. (Tr. 30-31). And earlier in the decision, the ALJ noted an August 2015 MRI of Mr. Dellarco's cervical spine and a course of formal physical therapy that he underwent between September 24 to October 26, 2015. (Tr. 28).

With respect to Mr. Dellarco's respiratory problems (*i.e.*, COPD and asthma), the ALJ noted that Mr. Dellarco did not require any specialized care between a July 2016 pulmonology consult and his date last insured, suggesting that inhalers were effective in controlling symptoms. (Tr. 26, Tr. 317-22). The ALJ noted that Mr. Dellarco only infrequently presented to Dr. Evan with respiratory complaints, and Dr. Evan's examinations of Mr. Dellarco routinely documented

25

a normal respiration rate and clear lung upon listening with a stethoscope. (Tr. 27, 475, 480-81, 489, 494, 496, 498, 500-01, 503, 505, 508).

The ALJ also discussed Mr. Dellarco's course of treatment. *See* 20 C.F.R. § 404.1529(c)(3)(iv)(v); SSR 16-3p, 2017 WL 5180304, at *9 ("[If] the … extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, … we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."). Here, although Mr. Dellarco appears to contend otherwise (*See* ECF Doc. 8, PageID#925-26), the ALJ acknowledged that Mr. Dellarco relied on Kenalog injections for treatment of his neck pain. (*See* Tr. 29). Specifically, the ALJ noted that on June 27, 2016, Mr. Dellarco reported to Dr. Donatelli that Dr. Evan's regular pain injections had been "quite helpful" until recently in managing his pain symptoms. (Tr. 29, 332). The ALJ also observed that Dr. Donatelli prescribed oral tramadol medication and recommended a three-part series of cervical facet-joint injections that he administered on July 23, August 9, and August 23, 2016. (Tr. 29, 336, 338, 551, 553, 602). The ALJ also indicated that Mr. Dellarco began to make infrequent office visits and complained less about his symptoms between 2016 and 2019. (Tr. 29 (citing Tr. 489, 494, 500) ("Several of the office visits appear to be prompted by no symptoms and only a request to have another Kenalog injection, which are infrequent and become more distanced over the latter two years of the relevant timeframe.")).

Finally, the ALJ also discussed Mr. Dellarco's daily activities in his SSR 16-3p assessment. (*See* Tr. 32); *see* 20 C.F.R. § 404.1529(c)(3)(1); *see also Temples v. Comm'r of Soc. Sec.,* 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible*)*. The ALJ noted that Mr. Dellarco stated in his August 2020 Function Report and at his

26

administrative hearing that he: lives with his wife and two adult daughters; drives short distances in his community (limited by the numbness in his hands for longer driving); makes coffee, cooks meals, and grills meats; attends regularly to personal bathing; and performs small chores around the house (but alleges that he needs to take breaks due to his neck pain, shortness of breath, and other physical symptoms). (Tr. 32 (citing Tr. 259-62)). Yet, the ALJ pointed to an October 2019 treatment notes where Mr. Dellarco informed Dr. Evan that he injured himself while he was on a ladder cleaning his pontoon boat. (Tr. 32 (citing Tr. 480)). This activity, the ALJ concluded, "suggest[s] some additional activity than [Mr. Dellarco's] written statements and testimony supplied in connection with his application would otherwise suggest." (Tr. 32). Although none of the activities considered alone warranted a finding of greater limitations than supported by the ALJ's earlier analysis of the medical evidence, the ALJ concluded that "considering [Mr. Dellarco's daily activities] in the aggregate and in appropriate context and combination with those medical factors" lent further support to his conclusion that Mr. Dellarco was capable of engaging in sustained work activity within the parameters of the RFC. (Tr. 32).

For the first time in his Reply Brief, Mr. Dellarco raises the argument that the ALJ failed to properly evaluate his subjective complaints regarding his upper extremity neuropathy. Specifically, Mr. Dellarco states that the ALJ discussed an EMG and determined that it was not diagnostic of separate peripheral neuropathy or mononeuropathy. (ECF Doc. 10, PageID#950 (citing Tr. 29, 349)). Mr. Dellarco argues that the ALJ was incorrect, however, because the EMG summary notes that there were multiple mononeuropathies, but not peripheral neuropathy. (*Id.* (citing Tr. 349)). Mr. Dellarco argues that this EMG - along with his testimony that pain radiated down his arms to hands leading to numbness (Tr. 59) and treatment records containing his

27

complaints of tingling and numbness in his upper extremities (Tr. 320, 332, 339, 343, 361, 551, 553) - support his subjective complaints.

This new argument asserted for the first time in Mr. Dellarco's Reply Brief attempts improperly to recast and expand his argument regarding whether the ALJ failed to articulate any supportable rationale for the ALJ's findings on the consistency of Mr. Dellarco's statements with the medical evidence. Significantly, Mr. Dellarco wholly failed to cite to *any* record evidence beyond his own hearing testimony in support of his Merits Brief argument. (*See generally* ECF Doc. 8, PageID#929-30). Indeed, citing to only his hearing testimony, Mr. Dellarco asserted in his Merits Brief "that the ALJ must articulate a reason for discrediting the claimant's testimony beyond a boilerplate." (*Id.* at PageID#929). He now attempts to asserts a more developed argument by offering the EMG record as proof that the evidence - not cited or even alluded to in his Merits Brief argument - was consistent with his hearing testimony about pain, numbness, and tingling in his upper extremities. (*See* ECF Doc. 10, PageID#950).

Yet it is well-established that arguments raised for the first time in a reply brief are waived. *See Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) ("We have consistently held, however, that arguments made to us for the first time in a reply brief are waived."); *Bender v. Comm'r of Soc. Sec.*, No. 11-CV-1546, 2012 WL 3913094, at *8 (N.D. Ohio Aug. 27, 2012) ("A reply brief provides a plaintiff the opportunity to respond to arguments raised for the first time in the defendant's brief. But, the plaintiff cannot wait until its reply brief to assert new arguments because such a practice would effectively deprive the defendant of the opportunity to expose weaknesses in the plaintiff's arguments") (citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008)).[10]

---

[10] *See also Cheuvront v. Comm'r of Soc. Sec.*, No. 5:19-cv-00360, 2019 WL 7049106, at *15 (N.D. Ohio Dec. 23, 2019) (noting that plaintiff "arguably forfeited" argument that he met or medically equaled a listing by "articulating

Even if this new argument was not waived, however, it does not support Mr. Dellarco's contention that the ALJ did not provide a supportable rationale regarding discounting his upper extremity symptoms. The EMG summary demonstrates evidence of distal median and ulnar compressive neuropathies and only components of demyelination. (Tr. 349). Dr. Cerimele stated that these are considered multiple mononeuropathies - not peripheral neuropathy - because the radial sensory conductions are normal. (*Id.*). Yet, this was not the ALJ's sole rationale for discounting Mr. Dellarco's testimony. In fact, the ALJ pointed to Mr. Dellarco's September 2016 and October 2016 follow-up visits with Dr. Donatelli, where Dr. Donatelli found no change in the initial examination's findings. (Tr. 29).

Specifically, these findings included intact sensation in both upper extremities (despite reflex loss), negative Spurling's test for clinically evidenced nerve-root or spinal cord compression at the cervical spine, normal muscle strength and tone in all groups of the upper extremities, and normal inspections, palpation and ranges of motion observed at the bilateral shoulders, elbows, wrists, and hands. (Tr. 29 (citing Tr. 334-335, 340-41, 344-45)). Moreover, as discussed earlier in this Report and Recommendation, the ALJ also observed that between 2017 to 2019, Mr. Dellarco's physician never referred Mr. Dellarco back to the pain specialist or physical therapist, which the ALJ determined "strongly indicates that the intermittent Kenalog injections and any prescribed medications were managing the…upper extremity symptoms to a point greater than reflected in the alleged constant persistence, high intensity, and functionally limiting effects of these specific symptoms on using the hands, lifting even a gallon of liquid with one arm, not completing cleaning and other chores around the house without taking breaks, standing for prolonged periods, and other physical abilities." (Tr. 30). Finally, the ALJ even noted that during

---

*some* criteria for the listings, but omitting specific references to record evidence that would support a finding that he met *all* the criteria") (emphasis in original).

the relevant timeframe no medical source indicated surgery as a treatment for Mr. Dellarco's upper extremity symptoms. (Tr. 30). All of this evidence constitutes substantial evidence to support the ALJ's assessment of Mr. Dellarco's alleged upper extremities symptoms.

Based on this evidence, the ALJ concluded that the "medical evidence supports no greater reduction in manipulative than frequent reaching, handling, and fingering with the bilateral upper extremities." (Tr. 34). Significantly, the RFC provided by the ALJ was much more restrictive than the limitations opined by the state agency physicians. Indeed, the state agency physicians did not identify any manipulative limitations as of Mr. Dellarco's date last insured. (Tr. 33, 84, 91).

In sum, as demonstrated in this section and earlier sections of this Report and Recommendation, the ALJ properly considered Mr. Dellarco's headaches, severe fatigue, shortness of breath, neck pain, back pain, and pain, numbness, and tingling in his lower and upper extremities in his decision. The ALJ also presented substantial evidence in support of his assessment of Mr. Dellarco's symptoms and his RFC determination. Because Mr. Dellarco has failed to demonstrate that the ALJ did not properly consider his symptoms under SSR 16-3p and articulate a supportable rationale, these sub-claims are without merit.

### E.  The ALJ Reasonably Concluded that Mr. Dellarco Could Return to His Past Job as a Sales Representative

Mr. Dellarco's final assignment of error challenges the ALJ's finding at Step Four of the sequential evaluation process. (ECF Doc. 8, PageID#930-32). He contends that his problems with pain, numbness, and tingling would have limited him to no more than occasional use of his upper extremities, which the VE opined would have precluded him from performing his past relevant work. (*Id.* at PageID#932). Mr. Dellarco further argues that if he was unable to perform his past work, Social Security regulations provide for a finding of disability unless he had transferable skills that would provide for direct entry into skilled work. (*Id.*). He asserts that if he was limited

to the sedentary level of exertion due to issues with his feet and numbness in his legs, the regulations would provide for a finding of disability. (*Id.*).

This argument fails for several of the reasons previously discussed earlier in this Report and Recommendation. At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an assessment of a claimant's ability to do work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a); see also SSR 96-8p, 1996 SSR LEXIS 5.

A hypothetical question is not improper solely because it does not include the entirety of a claimant's alleged impairments. Rather, an ALJ is required to incorporate only those limitations accepted as credible. *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact."). As to Mr. Dellarco's pain, numbness, and tingling in his upper extremities, the ALJ provided substantial evidence in support of his conclusion that the "medical evidence supports no greater reduction in manipulative than frequent reaching, handling, and fingering with the bilateral upper extremities." (Tr. 34; *see* Tr. 334-335, 340-41, 344-45, 489, 494, 500). Regarding Mr. Dellarco's lower extremities symptoms, the ALJ also provided substantial evidence in support of his conclusion that Mr. Dellarco could still perform light work as set forth above. (Tr. 30, 32; *see* Tr.

83, 90, 335, 340-41, 344-45, 479, 490, 499, 501, 506, 508). Specifically, the objective medical evidence reflected on several occasions that Mr. Dellarco had normal gait and normal strength, tone, and range of motion in his legs. (*See id.*) Accordingly, I recommend that the Court overrule Mr. Dellarco's assignments of error and affirm the ALJ's decision.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court OVERRULE Mr. Dellarco's assignments of error and AFFIRM the ALJ's decision.

Dated: April 20, 2023

_s/ Jennifer Dowdell Armstrong_
Jennifer Dowdell Armstrong
United States Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.** Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds

to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).